ACUMENICS RESEARCH & TECHNOLOGY, Plaintiff–Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Defendant–Appellee.

No. 87–1650.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 4, 1988.

Decided April 5, 1988.

Timothy Sullivan (Dykema, Gossett, Spencer, Goodnow & Trigg, Washington, D.C., on brief), for plaintiff-appellant.

Stuart Frisch, Office of the Gen. Counsel, Justice Management Div., U.S. Dept. of Justice, Washington, D.C. (Henry E. Hudson, U.S. Atty., Paula P. Newett, Asst. U.S. Atty., Alexandria, Va., Richard K. Willard, Asst. Atty. Gen., Leonard S. Schaitman, Asst. Director, Appellate Staff, Civil Div., U.S. Dept. of Justice, Washington, D.C., on brief), for defendant-appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and Joseph H. YOUNG, United States District Judge for the District of Maryland, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

This is a reverse Freedom of Information Act (FOIA), 5 U.S.C. § 552 case in which Acumenics Research and Technology, Inc. (Acumenics) seeks to prevent the Department of Justice (DOJ) from releasing certain pricing information that Acumenics submitted to the government as part of a contract proposal. Employing the standard prescribed in 5 U.S.C. § 706(2)(A) (whether agency action is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law"), the district court upheld DOJ's decision to release the information. Acumenics now appeals and we affirm.

## I

Acumenics is in the business of providing litigation support services. These services are often employed in document-intensive litigation and include tasks such as microfilming, photocopying, coding and indexing documents, and compiling bibliographies and reports. In November 1984, Acumenics was awarded a "fixed unit price" [1] contract to provide litigation support services to the Department of Justice, Land and Natural Resources Division. The contract provided for a base year with two one-year options to extend the contract, both of which were exercised by DOJ.

In the fall of 1986, DOJ received requests from two of Acumenics' competitors for technical and pricing information provided by Acumenics to DOJ as part of the 1984 contract. In accordance with its regulations, DOJ advised Acumenics of the requests and specifically instructed Acumenics to review the requested information to determine whether it was exempt from disclosure under exemption (4) of the FOIA. Aumenics responded with a memorandum that analyzed exemption (4) and concluded that virtually all of the information requested fell within the exemption. As to the unit price information, Acumenics specifically claimed that "[k]nowledge of Acumenics cost pricing would allow competitors to derive Acumenics labor rates and indirect rates." Acumenics did not object, however, to DOJ's release of the total contract price figure.

Approximately three months later, DOJ responded by letter to Acumenics' objections. DOJ agreed to withhold disclosure of all of the information claimed exempt by Acumenics except the unit pricing informa-

tion. DOJ's position was that (a) unit price information is generally subject to disclosure to unsuccessful contract bidders under Federal Acquisition Regulations, 48 C.F.R. § 15.1001(c)(1)(iv), and (b) Acumenics had not made the necessary showing to invoke exemption (4) that disclosure would cause competitive harm. DOJ also advised Acumenics that the information would be released ten days after Acumenics' receipt of the letter.

Discussions ensued between Acumenics and DOJ and Acumenics was granted an opportunity to meet with DOJ officials to review its position. At the meeting, Acumenics attempted to convince DOJ that disclosure would cause it competitive harm because a competitor could use the unit price information to calculate Acumenics' profit "multiplier." The multiplier is the product of a company's overhead, general and administrative costs (G & A), and profit, (overhead rate $\times$ G & A rate $\times$ profit), and is essentially the percentage of markup over and above direct costs which a company must charge to cover expenses and achieve its desired profit. Acumenics claimed that the unit price of a given contract item is the product of direct costs—specifically, direct labor costs—and the multiplier. Thus, with two out of three variables known—direct labor costs and the unit price—a competitor could simply calculate the third variable—the multiplier.

Crucial to Acumenics' argument then is its claim that direct labor costs themselves are generally known. Acumenics contended that the government's minimum wage guidelines for service contracts effectively standardize wages at the minimum level for any job category because there is an oversupply of available workers. As many items in the contract are really a unit of one day's work for an employee in a particular category, knowledge of the wage rate is equivalent to knowledge of the direct

---

**1.** A fixed unit price contract requires a company to propose an amount of payment for a defined unit of product of any given contract item. In Acumenics' contract, the products are mostly services or processes as opposed to physical items. For example, a contract item might be document coding, with the unit defined as "per page." The total price for any given line item is determined by multiplying the proposed unit price and the estimated number of units for that item.

labor cost. Acumenics also contended that even for items calculated as a unit of production, say a given number of coded documents, the direct labor cost still can be calculated because the rates of production for the various contract tasks are virtually standardized throughout the industry.[2] Essentially then, the following equation describes the unit price:

$$\text{unit price} = \underset{\text{cost}}{\text{direct labor}} \times \underset{\text{rate}}{\text{production}} \times \text{multiplier.}$$

Despite Acumenics' presentation, DOJ was not swayed from its position that the unit pricing information should be released. By letter to Acumenics, DOJ again emphasized that the Federal Acquisition Regulations generally provide for release of such information. DOJ also added two new reasons for disclosure: that (1) too many factors go into the unit price calculation for a competitor to easily derive Acumenics' pricing structure, and (2) DOJ believed that much of the information was released with Acumenics' knowledge in 1985, following the contract award. At the meeting, DOJ also expressed the opinion that, even if a competitor could use the unit price information to derive Acumenics' multiplier, such knowledge was significantly less valuable because the multiplier was three years old.

Not content with DOJ's decision, Acumenics brought this action. In addition to raising its previous arguments, Acumenics filed additional affidavits that raised a new argument against disclosure, apparently tailored to meet DOJ's claim that the multiplier information was stale. Acumenics now claimed that disclosure of the unit prices would allow a competitor to derive its relative profit strategy, allegedly one of the keys to successful bidding in the litigation support services industry. Essentially, Acumenics' position was that since direct labor costs and production rates are virtually standardized, a company can generate a successful bid by allocating more or less profit, no profit, or even a loss of profit to different items in the contract. Armed with knowledge of its multiplier, a

competitor could assign arbitrary values to overhead and G & A costs and be left with a figure representing Acumenics' profit for a given item. Though the profit figure would not be accurate, by using the same assumed values and calculating a profit figure for each contract item, a competitor could get a general picture of how Acumenics allocated its profit.

After a preliminary injunction was issued, DOJ moved for summary judgment. The district court found that *de novo* review was not necessary because the administrative record was sufficiently developed to consider all issues. Turning to the merits, the court ruled that Acumenics had failed to raise any facts which materially disputed DOJ's conclusion that disclosure of the unit pricing information would not cause competitive injury. Specifically, the court agreed with DOJ that many variables not readily known to Acumenics' competitors prevented use of the unit pricing information to derive Acumenics' multiplier or pricing strategy. Concluding that DOJ had given full consideration to Acumenics' position and that its decision was not arbitrary or capricious, the court granted DOJ's motion. Acumenics successfully moved for a stay pending appeal and took this appeal.

Acumenics primarily raises two issues here. First, Acumenics claims that it was entitled to a trial *de novo* in the district court and that the court erred by limiting its review to the administrative record. Second, Acumenics claims that the unit pricing information constitutes commercial or financial information within exemption (4) of the FOIA and the Trade Secrets Act, 18 U.S.C. § 1905, hence is not subject to disclosure. We take these in order.

## II

In support of its position that it was entitled to *de novo* review in the district court, Acumenics relies exclusively on two cases: (1) this court's decision in *Westinghouse Elec. Corp. v. Schlesinger*, 542 F.2d

---

**2.** For example, say the unit of work is coding 1000 documents, which it is generally known to take one employee three days to do. With the wage rate and production rate known, a com-petitor can simply multiply the wage rate by three days (production time per 1000 documents = 1 unit) to get the labor cost for that unit of work.

1190 (4th Cir.1976), and (2) the D.C. Circuit's decision in *Charles River Park "A", Inc. v. Dept. of H.U.D.*, 519 F.2d 935 (D.C. Cir.1975). Both *Westinghouse* and *Charles River Park* required trial *de novo* of the issue whether certain material fell within an FOIA exemption.

The court in *Charles River Park* reached its decision by analogy to a direct-FOIA suit. In the context of a direct-FOIA suit to compel agency disclosure, the FOIA itself provides for *de novo* review of an agency's claim that the information sought is covered by an exemption. *Charles River Park*, 519 F.2d at 940 & n. 4. If an agency decided that the information was not within an exemption, it would then be proper to review that decision requiring disclosure under an "abuse of discretion" standard. *Westinghouse* relied in part on *Charles River Park* to find that *de novo* review was appropriate when the evidence of confidentiality was insufficient on the administrative record. *Westinghouse*, 542 F.2d at 1207–08 & n. 58. The *Westinghouse* court also would have reached the same conclusion by finding federal jurisdiction in a reverse-FOIA case based on § 1331 and the Trade Secrets Act, or an implied right of action under the FOIA. *Id.* at 1209. *Westinghouse* and *Charles River Park* might both provide support for Acumenics' position, but both have been greatly discredited by the Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

■ *Chrysler* established that a private party seeking to block an agency's disclosure of information under the FOIA has no private right of action under either the Trade Secrets Act or the FOIA itself. *Chrysler*, 441 U.S. at 290–94, 99 S.Ct. at 1711–14 (FOIA); *id* at 316–17, 99 S.Ct. at 1725 (Trade Secrets Act). The Court did find that a private party so situated was entitled to review of the agency's disclosure decision under the Administrative Procedure Act (APA). Specifically, the Court found that the Trade Secrets Act barred disclosure of information falling within exemption (4) to the FOIA and thus, disclosure of such information would not be in accordance with law within the meaning of 5 U.S.C. § 706(2)(A). *Id.* at 318, 99 S.Ct. at 726. The APA, however, provides for *de novo* review under § 706(2)(F) in only limited circumstances. This circuit recognized this as well as the questionable validity of *Westinghouse* in *General Motors Corp. v. Marshall*, 654 F.2d 294 (4th Cir.1981). There this court properly acknowledged that the *Chrysler* decision meant that " '*de novo* review by the District Court is ordinarily not necessary,' " *id.* at 298 (citing *Chrysler*), but also that "there could be circumstances such as suggested in [§ 706](2)(F) in which the district court might [rightly] decide that 'trial *de novo* by the reviewing court' was necessary...." *Id.* Post–*Chrysler*, the D.C. Circuit also acknowledged that the viability of *Charles River Park* was in doubt, *see Worthington Compressors, Inc. v. Gorsuch*, 668 F.2d 1371, 1373 (D.C.Cir.1981) (denying petition to modify opinion), and has recently expressly accepted the dictate of *Chrysler* that *de novo* review would be extremely limited. *See National Org. for Women v. Social Sec. Admin. (NOW)*, 736 F.2d 727 (D.C.Cir.1984) *and CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1159 (D.C.Cir. 1987) (reaffirming the decision in *NOW*). The question thus becomes the circumstances that will justify *de novo* review under the *Chrysler* mandate.

■ In another context, the Supreme Court has interpreted § 706(2)(F) to justify *de novo* review in only two situations: (1) "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate," and (2) "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *see also Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (reaffirming *Overton Park* interpretation of § 706(2)(F)). We believe that an agency's decision to release information pursuant to the FOIA over the objections of the party that submitted the information to the government is "adjudicatory in nature." The narrow question then

presented is whether DOJ's factfinding procedures here were inadequate.[3]

■ DOJ has promulgated regulations implementing FOIA compliance. 28 C.F.R. §§ 16.1 *et seq.* As to requests for disclosure of business information, these regulations provide for: (1) prompt notice to the submitter of a third-party FOIA request, (2) an opportunity to present objections to disclosure with explicit direction to "specify all grounds for withholding any of the information" and to "demonstrate why the information is contended to be a trade secret or commercial or financial information" covered by exemption (4), (3) careful consideration by the agency of the submitter's objections, and (4) issuance of a statement of the reasons for rejecting the objections and the information to be disclosed, which also contains a disclosure date that contemplates time for the submitter to institute further action to block disclosure. 28 C.F.R. § 16.7. In this case, these procedures were followed and Acumenics was also granted a meeting with DOJ officials following DOJ's initial decision in favor of disclosure. At this meeting, Acumenics was allowed to (1) elaborate on its earlier objections, (2) present new materials in support of its position on disclosure, and (3) learn and address DOJ's specific contentions in favor of disclosure.

Considering the combination of the DOJ regulations and the opportunity for a face-to-face meeting that, in essence, amounted to an opportunity to appeal DOJ's tentative decision in favor of disclosure, we cannot say that the factfinding procedures utilized by DOJ were inadequate.[4] Acumenics was given every opportunity in advance of disclosure to present its strongest case against disclosure as well as an opportunity to answer DOJ's arguments in favor of disclosure. The district court did not err by declining to conduct a trial *de novo*.[5]

### III

■ Acumenics next claims that the unit pricing information falls within exemption (4) to the FOIA and the Trade Secrets Act.[6] Thus, regardless of the standard of

---

**3.** The D.C. Circuit recently followed this approach to analyzing the *de novo* review question under § 706(2)(F) in a reverse-FOIA case. In *NOW,* 736 F.2d 727 (D.C.Cir.1984), the court framed the issue as the adequacy of the FOIA-implementing regulations of the Office of Federal Contract Compliance Programs (OFCCP). Those regulations notify a submitter that his materials are subject to disclosure if he does not claim exemption. Submitters are allowed to identify that information believed to be exempt, as well as submit materials supporting such position. An agency officer must reach a decision within 10 days, and the submitter is entitled to appeal an adverse decision, and may provide additional materials.

A majority of the panel found that the combination of (1) notice, (2) the ability to submit materials to the first level decision maker, (3) the setting out of the agency's position by this decision maker, and (4) the opportunity to appeal the initial disclosure decision, constituted an adequate fact-finding process. *NOW* 736 F.2d at 745–46 (Mikva, J. & McGowan, J., concurring).

**4.** Our holding is confined to the facts of this case, which included notice of the request, an opportunity to object to disclosure, and an opportunity essentially to appeal the initial decision in favor of disclosure. As noted in the text, the DOJ regulations do not provide for any appeal-like procedure as granted in this case. We express no opinion as to whether the process implemented by the regulations themselves is adequate.

**5.** Our decision that the right to *de novo* review is thus limited means only that a party will not ordinarily be entitled to submit evidence to the district court bearing on the disclosure issue. This does not mean, however, that a party is foreclosed from introducing evidence on the preliminary question of the propriety of *de novo* review itself. This evidence would go solely to the question of the adequacy of the agency's fact-finding process, and would not be considered on the substantive disclosure question if *de novo* review were denied.

In conducting this inquiry, a district court should avoid operating under any hypertechnical and inflexible rule of what evidence is relevant to whether the fact-finding process was adequate. Nor should a district court focus on the agency's procedure in the abstract. Rather, the focus must be on the implementation of that procedure in a given case.

**6.** Acumenics also cursorily suggests, though apparently for the first time on this appeal, that the Trade Secrets Act is a qualifying withholding statute within the scope of exemption (3) to the FOIA, and that this provides an independent basis for withholding release of the unit price information. Acumenics' argument is premised on the decision in *Westinghouse* which held "that § 1905 [the Trade Secrets Act] is a statute

judicial review applied, Acumenics contends that the district court should not have granted summary judgment[7] upholding DOJ's decision to release the information.

The several exemptions contained in the FOIA are not "mandatory bars to disclosure." *Chrysler,* 441 U.S. at 293, 99 S.Ct. at 1713. Instead, if requested information falls within an exemption, the agency must exercise its discretion as to whether or not to release the information. *Id.* at 294, 99 S.Ct. at 1713–14. If, however, release of the particular information is barred by some other statute or regulation, the agen-

cy may not release it. The Trade Secrets Act makes criminal the unauthorized disclosure by a government employee or agency of information relating to the "trade secrets, processes, operations, style of work ... amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation or association...." 18 U.S.C. § 1905. And in *General Motors,* this court reaffirmed that the scope of the Trade Secrets Act is co-extensive with that of exemption (4) to the FOIA. *General Motors,* 654 F.2d at 297. Thus, for information falling within exemp-

---

qualifying under Exemption (3)...." *Westinghouse,* 542 F.2d at 1203. That exemption excepts from mandatory disclosure material

> specifically exempted from disclosure by statute (other than § 552(b)), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

Subsections (A) and (B) were added in 1976 and were "designed to narrow the scope of the prior-existing exemption...." *CNA,* 830 F.2d at 1137. The old exemption (3) simply excepted matters "specifically exempted from disclosure by statute."

*Westinghouse* was based on the unamended version of the exemption, and particularly the Supreme Court's decision in *FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), construing that exemption. As recognized by the court in *CNA,* the 1976 amendment to exemption (3) was intended to overrule *Robertson. CNA,* 830 F.2d at 1137 & n. 37 (citing H.R.Rep. No. 1441 (Conf.), 94th Cong., 2d Sess. 25, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2183, 2244, 2260–61). That the amendment seriously calls into question the validity of *Westinghouse* appears to have been recognized by this court in *General Motors* where we noted that:

> [W]e have held that "the scope of § 1905 and Exemption 4 of the FOIA are, ... 'the same,' or, ... coextensive.' Accordingly, material qualifying for exemption under (b)(4) falls within the material, disclosure of which is prohibited under § 1905. And this conclusion, as stated by us in *Westinghouse,* accords with the expression of congressional purpose in enacting the 1976 amendment of FOIA's exemption (3).

*General Motors,* 654 F.2d at 297 (footnote omitted). While *Westinghouse*'s logic contemplated that information outside exemption (4) might still fall within § 1905 and thus be exempt from disclosure under exemption (3), *General Motors* apparently recognizes that under the 1976 amendment to exemption (3), § 1905 does not bar disclosure of information that is outside

exemption (4). *General Motors,* 654 F.2d at 297 n. 9 (citing H.R.Rep. No. 880, pt. 1, 94th Cong., 2d Sess. 22–23, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2183, 2204–05 (noting that under the proposed House amendment to exemption (3), which closely resembled the amendment ultimately adopted, "if material did not come within the broad trade secrets exemption of the [FOIA], section 1905 would not justify withholding....")). Several other courts reading our decisions have regarded *Westinghouse* as effectively overruled by the 1976 amendment, *see, e.g., United Technologies Corp. v. Marshall,* 464 F.Supp. 845 (D.Conn.1979), and at least one court reads *General Motors* as reaching the same conclusion. *CNA,* 830 F.2d at 1141 n. 62.

While we are in general harmony with these interpretations, we need not for purposes of this decision answer whether *Westinghouse*'s interpretation of exemption (3) and § 1905 has continuing validity. Even if that were the case, we see no basis for Acumenics' argument that, even if the material here falls outside the scope of exemption (4), it is somehow still within the ambit of the Trade Secrets Act so that disclosure would be barred by exemption (3).

7. The government submitted an affidavit of Robert Day, Assistant Director, Contract Administration Service for DOJ's Justice Management Division. Day had supervisory responsibility for FOIA compliance for the Division. His affidavit summarized the administrative record and described the meeting that took place between Acumenics and DOJ. Acumenics claims that the district court should not have considered this affidavit as part of the administrative record.

It is not clear that the district court did indeed consider Day's affidavit as nowhere does it admit to doing so. Even if it did consider it, however, we do not believe this was in error. As noted above, the affidavit does no more than explain and elaborate on the administrative record and its use is therefore permissible. *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

tion (4), the Trade Secrets Act does bar an agency decision to release the information.

Exemption (4) has three requirements. It covers (1) trade secrets and commercial or financial information, (2) obtained from a person outside the government, (3) that is privileged or confidential. *National Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 766 (D.C.Cir.1974). As there is no question that the first two elements are met in this case, our focus is on the requirement that the information be privileged or confidential. Information is confidential if its disclosure is likely to (1) "impair the Government's ability to obtain necessary information in the future," or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks,* 498 F.2d at 770. Here, Acumenics has chosen to argue the second prong of this test.

Actually, Acumenics has put forth two arguments of competitive harm during the course of this case. It first argued to DOJ that release of the unit price information would reveal its profit multiplier, thus allowing a competitor to estimate its unit prices on future contracts. Acumenics refined its position in the district court, arguing that knowledge of the multiplier would allow a competitor to derive its pricing strategy. The district court's decision does not indicate whether it addressed Acumenics' second argument. Because this was first raised in the district court and because the court did not conduct a trial *de novo,* we must assume that it was not considered. This is of little consequence, however, because both arguments turn on a competitor's ability to derive Acumenics' multiplier, which ability itself turns on the same key assumptions: that direct costs and production rates are standardized and generally known throughout the industry. We do not believe that these assumptions are justified.

Acumenics' claim that production rates are standardized is unsupported by any independent evidence beyond the common sense recognition that many of the tasks are ·mechanical and repetitive. It seems equally a matter of common sense that production rates will vary depending on the equipment used by a company as well as the experience level of the employee doing the task. We also note that many other of the tasks involved are not simply mechanical and repetitive.

The business proposal to the contract undermines Acumenics' other assumption. This assumption actually has two parts: that (1) the direct cost element in the unit price calculation consists only of labor costs, specifically, "temporary" labor costs, and (2) because there is an oversupply of temporary labor to do the various contract tasks, companies can operate by paying only the minimum wage set by the service contract wage determination.

Acumenics has carefully hedged its position. Nowhere does it make the absolute claim that wages are standardized across the industry at the levels set by the wage determination. Instead, Acumenics makes a series of qualified claims: (1) that it *generally* pays its employees at the set minimum wage, (2) that the wage determination *effectively* standardizes wages, and (3) that the direct labor costs of Acumenics and its competitors are *virtually* the same. And while Acumenics claims that it generally pays employees the minimum wage for their job category, it acknowledges that a more experienced and capable employee can earn more by being promoted to a new job category that has a higher minimum wage.

The proposal also apparently shows two components of direct costs other than temporary labor. The first component is a miscellaneous category encompassing items like delivery, postage and storage costs. Despite the mundane appearance of these items, this category amounts to over one million dollars in each of the contract years. This is not an insignificant percentage of the yearly contract cost.

The second component is permanent labor costs, which comprises Acumenics' management team and support staff. Here, many of the job categories involved are for positions not covered by the wage determination. It is also unlikely that a

competitor would know Acumenics' permanent employee structure or how many, and in what positions, people are employed in this component.

The business proposal also undermines Acumenics' claim that temporary labor costs are fixed. First, the job categories listed in the proposal do not directly correspond to any of those listed on the wage determination incorporated into the contract. Neither do the wages listed for these job categories directly correspond to any of the wage figures on the wage determination. It would appear that a company has the ability to manipulate wages by manipulating the job category assigned to an employee doing a particular task. Third, the proposal acknowledges the existence of salary reviews and merit increases. Fourth, the proposal explicitly notes that the direct labor charge is based on *average* salary rates for each labor category. An averaging process suggests that all employees within a given category are not paid the same wage rate.

Considering the above factors, we agree with the district court's conclusion that there are too many unascertainable variables in the unit price calculation for a competitor to derive accurately Acumenics' multiplier. We therefore affirm the district court's decision upholding DOJ's decision to release the information.[8]

AFFIRMED.

---

**8.** Even were a competitor able to derive Acumenics' multiplier, we agree with DOJ's opinion that competitive harm would be minimal because the information is stale. The overhead rate and G & A rate are not constant and will vary depending on a company's backlog of work. Thus, it cannot confidently be assumed that the same multiplier will be used over an extended period of time.