**COMDISCO, INC., Plaintiff,**

v.

**GENERAL SERVICES ADMINISTRATION, Defendant.**

**Civ. A. No. 94–604–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 11, 1994.

Scott Alan Ford, Doyle & Bachman, Washington, DC, for plaintiff.

Rebeca O. Hidalgo, U.S. Atty., Alexandria, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

At issue in this reverse Freedom of Information Act[1] ("FOIA" or "the Act") case is whether certain unit price information contained in a government contract is "confidential" within the meaning of 5 U.S.C. § 552(b)(4) ("exemption 4") and therefore exempt from public disclosure. Defendant, General Services Administration ("GSA"), contends that one segment of the unit price information contained in Plaintiff Comdisco, Inc.'s ("Comdisco") contract bid is not confidential under exemption 4 of the Act and, thus, should be disclosed to the public pursuant to § 552's general disclosure mandates. In support of its position, GSA relies primarily on the two-part test outlined in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974) and later adopted by the Fourth Circuit in *Acumenics Research & Technology v. United States Department of Justice*, 843 F.2d 800 (4th Cir. 1988).

Comdisco, on the other hand, claims that the disputed price information is confidential and appropriately subject to exemption 4 protection. In so arguing, Comdisco urges the Court to follow the D.C. Circuit's recent refinement of the *National Parks* test as announced in *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C.Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). On these opposing legal grounds, both parties have moved for summary judgment.

1. 5 U.S.C. § 552.

## II.

Comdisco, a company located in Arlington, Virginia, is in the business of providing computers and computer-related services. On October 20, 1992, it submitted a proposal in response to a GSA solicitation for computers and computer-related services to be provided to various federal agencies in the event that a natural or man-made disaster rendered the agencies unable to meet their data processing needs with their own equipment and staff. To be eligible for the contract, Comdisco was required to include in its proposal a breakdown of unit prices for two categories of equipment and services. First, GSA requested specific pricing information for 18 "Core Systems," the fundamental computing and communications equipment and services that would be necessary to sustain the various agencies' needs in the event of a disaster. Second, GSA requested the contract bidders' unit prices for the "Additional System Resources" that would be provided under the contract. This second category comprised fees for specific optional items of hardware, software and related services that an agency subscribing to a Core System could order to customize or augment the equipment and services provided in the Core System. Following review of all the proposals submitted, GSA awarded the disaster recovery services contract to Comdisco in June, 1993. Incorporated in section B of the contract is the pricing information contained in Comdisco's contract proposal for both the Core Systems and the Additional System Resources.

In August 1993, GSA received a FOIA request for a copy of the disaster recovery services contract. As is customary, GSA notified Comdisco of the FOIA request and provided Comdisco with the opportunity to oppose disclosure of any portion of the contract and to submit details, if any, regarding why disclosure would cause the company substantial competitive harm. In response, Comdisco wrote a letter to GSA voicing its objections to public disclosure of, among other things, the pricing information contained in section B of the contract. Comdisco claimed that allowing its competitors access to Comdisco's unit pricing and overall pricing strategies would be detrimental to its ability to remain competitive in the governmental and commercial marketplaces. The record does not disclose what ultimately occurred with respect to the August 1993 FOIA request, and this specific request is not at issue in this case.

A second request was made in December 1993. At that time, an organization named FOIA Group, Inc. ("FOIA Group") made the FOIA request that forms the basis of the current dispute. This request specifically asked for a copy of Section B of the disaster recovery services contract. Because GSA had already sought and received Comdisco's input regarding the disclosure of Section B of the contract, GSA did not at this point notify Comdisco of the FOIA Group request or ask for repetition of its objections. In response to the FOIA Group request, GSA initially refused to grant access to any portion of the pricing information contained in section B of the contract, citing exemption 4. FOIA Group lodged an administrative appeal of this decision within GSA, at which time GSA orally requested Comdisco to present additional support for its position that all of the pricing information contained in Section B of the contract should remain sheltered from public view. Having received and reviewed another letter from Comdisco objecting to any disclosure of Section B, and after several telephone conferences with Comdisco, GSA ultimately determined that the Core System pricing information is confidential under exemption 4, but that, despite Comdisco's continued protests to the contrary, the Additional System Resource fees are not.

In concluding that the Core System prices are confidential under exemption 4, GSA reasoned that those prices reflect in part Comdisco's risk assessments for the contract, that is, (i) the likelihood of a disaster occurring, (ii) the intensity of, and destruction resulting from, such an occurrence, and (iii) the nature and quantity of equipment and services that an agency would need in the event of such a disaster. Thus, GSA concluded, public disclosure of the Core System pricing information would place Comdisco at a competitive disadvantage, permitting its competitors to "free ride" off of Comdisco's substantial investment in formulating risk assessments and calculating appropriate fees. Since

Comdisco and GSA are in agreement to this extent, GSA's decision to exempt the Core System unit prices from FOIA's disclosure requirements is not at issue here.

But GSA did not reach the same conclusion with respect to the Additional System Resource prices. Instead, GSA determined that these prices, unlike the Core System prices, are not confidential under exemption 4 and should be disclosed pursuant to § 552's general disclosure command. Applying *National Parks'* two-part test, as adopted by the Fourth Circuit in *Acumenics,* GSA concluded that release of the Additional System Resources unit prices would neither impair the government's ability to obtain similar information in the future, nor cause substantial competitive harm to Comdisco. First, GSA reasoned that there are sufficient financial incentives for companies to compete for government contracts to ensure continued competitive bidding despite the release of pricing information. Second, GSA concluded that, unlike the Core System prices, release of the Additional System Resource unit prices would not cause Comdisco competitive harm since they did not reflect Comdisco's risk assessments or pricing strategy. Furthermore, GSA noted the similarity between the Additional System Resource prices and the unit prices for multiple award schedule contracts, which are routinely available for public inspection.

In its letters and oral communications with GSA, Comdisco opposed GSA's decision to release the Additional System Resource prices, claiming that their submission to the government was voluntary, and, thus, the more lenient test announced by the D.C.Circuit in *Critical Mass* should apply. Because it would not customarily release its pricing information to the public, Comdisco argued that it met § 552(b)(4)'s confidentiality exemption. Moreover, Comdisco contended that even under the traditional *National Parks* test, its unit prices for the Additional System Resources are confidential since they constitute the "building blocks" for the Core System prices. As a result, Comdisco insisted, a resourceful competitor could simply

reverse engineer from the Additional System Resource unit prices to derive the confidential Core System prices.

As noted, GSA rejected Comdisco's protests, stating that they were merely conclusory allegations of confidentiality that lacked factual support for the claimed correlation between the Core System prices and the Additional System Resources fees. Observing that, as a general matter, the prices the government pays for its goods and services "are a matter of public record," GSA concluded that disclosure in this instance was simply "a price of doing business with the Government." (Letter from Persinger to Garstka of 8/8/94 at 1). From this decision, Comdisco appeals.[2]

### III.

■■■ The threshold question is the proper scope and standard of review. The Supreme Court has noted that a party seeking to prevent an agency's disclosure of records under FOIA has no private right of action to prevent the disclosure. *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Rather, the party's sole recourse is to seek review of the agency's disclosure decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (1994). Under the APA, judicial review of agency decisions must ordinarily be made on the record, and *de novo* review is permitted only when (i) "the action is adjudicatory in nature and the agency factfinding procedures are inadequate," or (ii) "issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Acumenics,* 843 F.2d at 804 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). And, as the Fourth Circuit's opinion in *Acumenics* makes clear, "an agency's decision to release information pursuant to the FOIA over the objections of the party that submitted the information to the government is 'adjudicatory in nature.'" 843 F.2d at 804. Thus, the relevant inquiry in this case is whether GSA's "factfinding procedures [were] inadequate." And, clearly they

---

**2.** The parties have stipulated that GSA will not release the Additional System Resource unit prices.  ing information pending the outcome of this action.

were not, as evidenced by GSA's numerous written and oral consultations with Comdisco. Comdisco's objections to disclosure of any of the unit pricing information were already on record when GSA initially rejected FOIA Group's disclosure request. When FOIA Group appealed this decision, GSA sought and obtained additional input from Comdisco before rendering its final decision. Because Comdisco was accorded a full and fair opportunity to state and support its position on disclosure, it cannot be said that GSA's fact-finding procedures were inadequate. *Cf. Acumenics*, 843 F.2d at 805. As a result, the proper scope of review in this action is limited to the administrative record.

■ Next, with respect to the standard of review, the proper inquiry is whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). If none of these, then the agency action must be upheld, even if the court in an independent inquiry would have reached a different result. *See, e.g., Natural Resources Defense Council v. EPA*, 806 F.Supp. 1263, 1274 (E.D.Va.1992), *aff'd*, 16 F.3d 1395 (4th Cir. 1993). With the standard and scope of review stated, analysis properly proceeds to the terms of the FOIA exemption at issue.

### IV.

■ Congress enacted FOIA in an effort to guarantee public access to most government documents and, thus, "to ensure an informed citizenry." *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (citation omitted). Yet, recognizing that significant private interests counsel against disclosure of certain government materials in some circumstances, Con-

gress exempted nine categories of information from FOIA's general disclosure mandates. Pertinent here is exemption 4, which protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Since it is undisputed that the Additional System Resource unit prices are "commercial or financial" and were "obtained from a person," the only remaining matter in issue is whether this pricing information is "confidential" within the meaning of exemption 4, and thus, appropriately shielded from public view.

■ The Court of Appeals for the D.C. Circuit confronted essentially this issue twenty years ago in *National Parks*, 498 F.2d 765. There, the petitioners sought to compel the Department of the Interior to disclose certain documents regarding the finances of companies that operated concessions on national park-land. In determining whether those documents were confidential under exemption 4, the D.C. Circuit announced a two-part test that has since won the endorsement of seven other circuits, including the Fourth Circuit.[3] Under the *National Parks* analysis, information is confidential for purposes of exemption 4 if it is likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 498 F.2d at 770. Noting that the submission of the financial statements was a mandatory condition of operating concessions in the national parks, the court concluded that disclosure of the concessionaires' financial information would not "impair the Government's ability to obtain necessary information in the future." *Id.* The court then

---

**3.** *See, e.g., 9 to 5 Org. for Women Office Workers v. Board of Governors of the Fed. Reserve Sys.*, 721 F.2d 1, 7–10 (1st Cir.1983); *American Airlines, Inc. v. National Mediation Bd.*, 588 F.2d 863, 871 (2d Cir.1978); *Acumenics Research & Technology v. DOJ*, 843 F.2d 800, 807 (4th Cir.1988); *Sharyland Water Supply Corp. v. Block*, 755 F.2d 397, 399 (5th Cir.), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 697 (1985); *General Elec. Co. v. NRC*, 750 F.2d 1394, 1402–03 (7th Cir. 1984); *Pacific Architects & Eng'rs Inc. v. Department of State*, 906 F.2d 1345, 1347 (9th Cir. 1990); *Anderson v. HHS*, 907 F.2d 936, 946 (10th

Cir.1990). No circuit court has rejected the *National Parks* test. Although the District of Columbia Circuit has since modified *National Parks* in *Critical Mass*, 975 F.2d at 879, no other circuit has considered or adopted this modification. *But see, Environmental Technology, Inc. v. EPA*, 822 F.Supp. 1226 (E.D.Va.1993) (district court adopted *Critical Mass* standard); *Africa Fund v. Mosbacher*, No. 92 Civ. 289, 1993 WL 183736, at *6–7, 1993 U.S.Dist. LEXIS 7044, at *20 n. 3 (S.D.N.Y. May 26, 1993) (*Critical Mass* standard cited in dicta).

remanded the case for further proceedings regarding the possibility of competitive harm arising from disclosure. *Id.*

Fourteen years later, when presented with an essentially similar issue, the Fourth Circuit expressly adopted the *National Parks* two-part test. *Acumenics,* 843 F.2d at 807. In *Acumenics,* a reverse FOIA case closely analogous to the instant case, the petitioner submitted certain unit pricing information to the Department of Justice ("DOJ") as part of a contract proposal. In response to a subsequent FOIA request, and despite repeated objections from the petitioner, DOJ determined that the pricing information was not confidential under exemption 4 and therefore subject to disclosure. In support of its decision, DOJ cited (i) the fact that the Federal Acquisition Regulations generally provide for disclosure of unit price information to unsuccessful contract bidders, 48 C.F.R. § 15.1001(c)(1)(iv), and (ii) the fact that the petitioner had not demonstrated any likelihood of competitive harm from disclosure. *Acumenics,* 843 F.2d at 802, 803. On appeal, the Fourth Circuit applied the *National Parks* two-prong test and upheld DOJ's determination that the disputed pricing information was not confidential. *Id.* at 807–08.[4] In particular, the court rejected the petitioner's argument that disclosure of the unit prices would cause substantial competitive harm by allowing a competitor to derive the petitioner's profit multiplier and, consequently, to estimate the petitioner's future contract bids. Noting that the petitioner's unit prices constituted the product of three elements, namely (1) direct labor costs, (2) production rate, and (3) profit multiplier, the court concluded that "too many unascertainable variables" enter into the first two elements to allow a competitor to derive the confidential profit multiplier solely from the disclosure of the unit prices. *Id.* at 803, 807–08. *See also, Pacific Architects & Eng'rs v. United States*

*Dep't of State,* 906 F.2d 1345, 1347 (9th Cir. 1990) (disclosure of unit price rates would not reveal submitter's profit margin because of the "fluctuating variables" entering into those rates). Therefore, with no evidence to support the claimed likelihood of competitive harm, the court approved DOJ's disclosure decision.

The instant case fits comfortably within the four corners of *Acumenics.* Both cases involve the question whether exemption 4 protects certain government contract price information from disclosure when that information is required to be submitted in the contracting process. Both cases involve a claim by the party submitting the price information that disclosure of the information would cause it to suffer competitive harm. And in both cases, the agency's disclosure decision was not arbitrary, capricious, an abuse of discretion, or contrary to law.

This conclusion is confirmed by measuring GSA's disclosure decision against the *National Parks* two-prong test. First, GSA's decision that disclosure of Comdisco's Additional System Resource prices would not "impair the Government's ability to obtain necessary information in the future" cannot be seriously questioned. Indeed, it is the *government's* interests that are protected by this first prong; thus, it follows that it is the *government* that is best situated to make the determination of whether disclosure would inhibit future submissions. *See, e.g., Hercules, Inc. v. Marsh,* 839 F.2d 1027, 1030 (4th Cir.1988) (submitter would not be allowed to argue government "impairment" prong on the government's behalf); *Orion Research Inc. v. EPA,* 615 F.2d 551, 554 (1st Cir.) (stating that "[t]he agency is in the best position to determine the effect of disclosure on its ability to obtain necessary technical information"), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). *See also,*

---

4. Because the petitioner based its arguments only on the second, "competitive harm" prong of *National Parks,* the *Acumenics* panel did not discuss in any detail the government "impairment" prong. *Acumenics,* 843 F.2d at 807. Since the government had consented to disclosure, it evidently believed that its interest in obtaining competitive bidding in the future would not be hampered by disclosure of the unit price information.

Thus, the petitioner was in no position to assert government interests in *non*-disclosure. *See Hercules, Inc. v. Marsh,* 839 F.2d 1027, 1030 (4th Cir.1988) (in reverse FOIA case, where government did not raise concerns that disclosure would impair future access to similar information, submitter would "not be permitted to raise [the] issue on the [government's] behalf.").

*General Elec. Co. v. NRC,* 750 F.2d 1394, 1402 (7th Cir.1984) (rejecting need for judicial review of the "quintessentially managerial judgment" that government's interests will not be impaired by disclosure of submitted materials). Because in this case, as in *Acumenics,* the government *wants* to disclose the disputed pricing information, it would be nonsense to block disclosure under the purported rationale of protecting government interests.[5] Therefore, the Additional System Resource unit prices cannot be rescued from disclosure under the "impairment" prong of the *National Parks* test.

The Additional System Resource prices fare no better under the second prong, as Comdisco cannot show that disclosure would likely result in competitive harm. GSA provided Comdisco ample opportunity to demonstrate that disclosure of these unit prices would give competitors insight into Comdisco's confidential pricing strategies. Comdisco's effort fell short, for GSA ultimately concluded that the Additional System Resource prices were, like the unit prices in *Acumenics,* the sort of pricing information routinely disclosed under the Federal Acquisition Regulations. And, as *Acumenics* reflects, a submitter cannot gain the protection of exemption 4 simply because disclosure will inform competitors of the contract price. *See Acumenics,* 843 F.2d at 807–08. To justify pro-

tection under exemption 4, a submitter must present persuasive evidence that disclosure of the unit prices would reveal some confidential piece of information, such as a profit multiplier or risk assessment, that would place the submitter at a competitive disadvantage. Here, the Additional System Resources are simply peripheral equipment and services that may be ordered by an agency to enhance or augment its Core System. Unlike the Core System prices, the Additional System Resource prices in no way reflect Comdisco's risk assessments for the contract, such as its calculations of the probable frequency and intensity of disasters. And, as noted, it is only the risk assessment variable that warrants protecting the Core System prices from disclosure.[6] Therefore, GSA's conclusion that Comdisco would not suffer substantial competitive harm from disclosure of the Additional System Resource prices was not arbitrary, capricious, or an abuse of discretion, nor was it otherwise contrary to law.

## V.

To avoid the adverse result compelled by the *National Parks* test, Comdisco argues that GSA's reliance on that test is "contrary to law" given the D.C. Circuit's recent modification of *National Parks* in *Critical Mass,*

---

**5.** Nor does it matter that on some occasions, the facts may ultimately disprove the assumption that the government knows best its own interests. Courts should not second-guess the government's assessment of its own interests.

**6.** Comdisco argues that disclosure of the Additional System Resource fees is tantamount to disclosure of the concededly confidential Core System prices because there is a uniform correlation between the Core System prices and the Additional System Resource prices. This argument does not bear scrutiny. While it may be true that some of the equipment contained in the Core Systems overlaps with certain Additional System Resource equipment, it is not true that a competitor could use the latter to calculate the former. As noted previously, the Core System prices do not reflect simply the aggregate costs of the required equipment. They reflect this and more, namely the costs of corresponding services, a significant factor reflecting Comdisco's risk assessment. Indeed, the record reflects that the cost of providing the Core Systems depends in large part on the likelihood of a disaster and its probable intensity, factors that play no role in

the Additional System Resource prices. As a result, Comdisco presented no persuasive evidence to GSA that a competitor could derive the confidential Core System prices from the disclosure of the Additional System Resource prices.

Comdisco also points out that if GSA releases both the Additional System Resource prices and the total delivery price, then a competitor could easily calculate the Core Systems unit prices through simple subtraction (total delivery price − Additional System Resource price = Core System price). Even GSA concedes, as it must, that Comdisco's fear of reverse engineering could be realized in this event. But disclosure of total delivery price is not a part of the FOIA request at bar and is not an issue here. Should GSA decide to disclose the total delivery price, Comdisco may at that time raise its objections through administrative channels, and, if necessary, through subsequent court action. Nonetheless, it is worth noting in this regard that GSA has stated that if its decision to release the Additional System Resource prices is judicially upheld, it will not publicly disclose the total delivery price. (Letter from Persinger to Garstka of 8/8/94, at 2).

975 F.2d at 879. In *Critical Mass*, the court retained the *National Parks* analysis for information supplied to an agency pursuant to government mandate, but it adopted a more lenient standard for information submitted to the government on a voluntary basis. Specifically, the court concluded that materials submitted to an agency voluntarily are confidential for purposes of exemption 4 if they are "of a kind that would customarily not be released to the public by the person from whom [they were] obtained." *Critical Mass,* 975 F.2d at 879. In urging the application of this standard, Comdisco contends not only that its unit pricing information was submitted voluntarily, a prerequisite under *Critical Mass,* but also that the Fourth Circuit, if given an opportunity, would follow the D.C. Circuit in its revision of the *National Parks* test.

Comdisco's argument is unpersuasive. On the most fundamental level, this Court is bound by Fourth Circuit precedent. And, in this regard, the Court cannot ignore the controlling language of *Acumenics,* which, unlike *Critical Mass,* did not limit the application of *National Parks* to information submitted to the government under compulsion.[7] Rather, the Fourth Circuit adopted the *National Parks* test in its entirety and without qualification. It is, therefore, controlling here.

Even assuming that *Acumenics* should be read as limited to mandatory submissions, as Comdisco urges, it is doubtful that the Fourth Circuit would be persuaded to embrace the *Critical Mass* standard with respect to voluntary submissions. As an initial matter, it is worth noting that of the eight circuits that have adopted the *National Parks* test, none, other than the D.C. Circuit, has confined that test to the realm of information submitted under compulsion.[8] Furthermore, there is no sound reason for limiting *National Parks* to information submitted under compulsion. To the contrary, an analysis of the interests served by exemption 4 confirms that the *National Parks* two-prong test properly accommodates both information voluntarily submitted to the government and information submitted under compulsion.

As the D.C. Circuit recognized in *National Parks* and *Critical Mass,* two distinct interests are served by exemption 4. The first such interest is "the need of government policymakers to have access to commercial and financial data." *National Parks,* 498 F.2d at 767, *cited in Critical Mass,* 975 F.2d at 877–78. This interest is accommodated by the first prong of the *National Parks* test, which ensures that government efforts to obtain information from companies and individuals are not hampered by potential public disclosure. And it is under *this* prong of the *National Parks* test that inquiry is appropriate into whether the disputed information reached the agency pursuant to some government mandate or, instead, by purely voluntary act. As the *Critical Mass* court recognized, the government's efforts to obtain desired information generally will not be impaired by the prospect of disclosure when

---

7. Indeed, the disputed contract pricing information in *Acumenics,* like the disputed information here, was not submitted pursuant to any government mandate. While it is true that to be eligible for a government contract, the bidder is required to submit certain pricing information, the government can at no stage of the bidding process compel the bidder to produce that information. Although the government may refuse to entertain the proposal if the desired information is lacking, no legal penalty accompanies the failure to cooperate. This suggests that the information was more voluntary than compulsory. Thus, to limit *Acumenics* to mandatory submissions would be to controvert the underlying facts of that case. Furthermore, even assuming, *arguendo,* that the contract pricing information in *Acumenics* was mandatory, Comdisco's position fails nonetheless, since consistency would demand that its contract pricing information too would be man-

datory. The more lenient "customarily provided" test of *Critical Mass,* from which Comdisco seeks to benefit, applies only to voluntarily submitted information. Comdisco's flawed position would have pricing information contained in government contract proposals labeled as mandatory for one purpose and voluntary for another.

8. *See* cases cited *supra* note 3. It merits mention that one case arising out of the Eastern District of Virginia adopted the *Critical Mass* test. *Environmental Technology, Inc. v. EPA,* 822 F.Supp. 1226 (E.D.Va.1993). That opinion provided little justification for its conclusion that *Critical Mass* would be persuasive to the Fourth Circuit and would not contravene the *Acumenics* precedent. In any event, this Court declines to follow that decision.

**518**

that information is compelled by statute or other mandate. *See Critical Mass,* 975 F.2d at 878. On the other hand, the government may well find it difficult to obtain voluntary responses to questionnaires and other informal inquiries if the submitter does not customarily release such information to the general public and knows that the information, if submitted, will become publicly available.[9] *See Critical Mass,* 975 F.2d at 878. In short, the first prong of the *National Parks* test already largely incorporates the voluntary/mandatory distinction urged in *Critical Mass,* and in so doing, properly accommodates the governmental interest in ensuring continued access to desired information.

Yet a second interest protected by exemption 4 is the interest of the individual in remaining free from the "competitive disadvantages" that may result from disclosure of certain financial and commercial information. *National Parks,* 498 F.2d at 768, *cited in Critical Mass,* 975 F.2d at 877–78. It is this interest that finds protection in the second prong of the *National Parks* test. But unlike the analysis under the first prong, the voluntary/mandatory distinction is of no relevance here. Whether disclosure of the disputed information will subject the submitter to competitive harm is a question wholly unrelated to the voluntariness of the submission. Thus, with respect to the individual's interest in avoiding competitive harm, the second prong of the *National Parks* test correctly calls for an objective examination of whether substantial competitive harm would likely result from disclosure. Contrary to the claim in *Critical Mass* that the revised test is "objective," 975 F.2d at 879, the inquiry into whether a voluntary submitter customarily releases the disputed information to the general public risks converting the test into a purely subjective one over which the submitter has exclusive or substantial control.[10]

In sum, the voluntary/mandatory inquiry is relevant only to the initial question whether the government's efforts to obtain desired information in the future will be hampered by the specter of public disclosure. If voluntary, then the submitter's *subjective* belief in the information's confidentiality becomes important, though not dispositive, to a determination of the likelihood that future submissions will be reduced. If despite the voluntariness of the submission, the government does not fear decreased access to desired information, then the government's interest is adequately protected, and the only remain-

9. Of course, while the results of the impairment prong analysis may generally divide along these lines, the voluntary/mandatory distinction is certainly not dispositive of whether the government's interest in obtaining information in the future will be impaired in a given case. For instance, situations may occur where the government seeks to prevent disclosure of even required submissions for fear that the quality of information provided will deteriorate if disclosure of the submission is required. *See, e.g., Washington Post Co. v. HHS,* 690 F.2d 252, 268–69 (D.C.Cir. 1982). On the other hand, there may be sufficient external incentives underlying certain voluntary submissions, such as the financial rewards that may accompany a successful government contract proposal, to ensure continued government access to the desired information despite the prospect of public disclosure. *See, e.g., Racal–Milgo Gov't Sys. v. Small Bus. Admin.,* 559 F.Supp. 4, 6 (D.D.C.1981) (stating that "[i]t is unlikely that companies will stop competing for Government contracts if the prices contracted for are disclosed"); *Badhwar v. United States Dep't of the Air Force,* 622 F.Supp. 1364, 1377 (D.D.C. 1985) (no impairment since contractors are unlikely to give up financial rewards of contracting with government in order to shield technical reports from public view). Or, in cases like *Critical Mass,* the government may not fear the effects of disclosing voluntarily submitted information if it has the power to compel such submissions. *See Critical Mass,* 975 F.2d at 874–75 (citing *Critical Mass I,* 830 F.2d 278, 283–84 (D.C.Cir.1987)).

10. *See Critical Mass,* 975 F.2d at 882 (Ginsburg, Ruth Bader, J., dissenting). As noted, the voluntary submitter's subjective view regarding the information's confidentiality is an appropriate, indeed necessary, factor in analyzing confidentiality under the "impairment" prong. Thus, as a general matter, the *National Parks* and *Critical Mass* tests will often obtain the same results. The two tests provide different results only in those cases where the submitter provides information voluntarily, but the government's access to that information will not be impaired by disclosure, either by virtue of its power to compel the information or in light of extra-legal incentives for continued submissions. *See supra* note 9. And it is in these cases, where the government's interest is adequately protected despite disclosure of voluntarily submitted information, that the objective, second prong analysis of *National Parks* is required.

ing inquiry is, *objectively,* whether the individual's interest in avoiding competitive harm will also be adequately protected. The *National Parks* test serves this function well and does not need the *Critical Mass* modification. Therefore, GSA's motion for summary judgment is **GRANTED,** and Comdisco's motion for summary judgment is **DENIED.**

An appropriate Order shall issue.