MCDONNELL DOUGLAS CORPORATION,
Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE AIR FORCE, et al.,
Defendants.

No. Civ.A. 00–1693(RWR).

United States District Court, District of Columbia.

Aug. 27, 2002.

Rodney Fred Page, Stephen Sheldon Kaye, Bryan Cave, L.L.P., Washington, DC, for Plaintiff.

Tricia S. Wellman, U.S. Department of Justice, Office of Information & Privacy, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

ROBERTS, District Judge.

Plaintiff McDonnell Douglas Corporation ("MDC"), a wholly-owned subsidiary of The Boeing Company ("Boeing"), brought this "reverse" Freedom of Information Act ("FOIA") case challenging the decision of the United States Department of the Air Force ("USAF") to disclose the contents of Boeing's contract with USAF pursuant to a FOIA request from Boeing's

competitor, Lockheed Martin Aircraft and Logistics Center ("Lockheed"). The parties filed cross motions for summary judgment. Because the USAF's decision to release the contested information was not arbitrary or capricious, MDC's motion for summary judgment will be denied, and the defendants' motion for summary judgment will be granted.

## BACKGROUND

The Air Force solicited bids on a one-year contract with options for eight additional years to provide supplies and services for KC-10 and KDC-10 aircraft. Bidders were required to submit detailed cost and pricing information in order for their bids to be considered. (Administrative Record ("AR") 52 at 40–41; AR 53.) Boeing submitted a detailed contract proposal, or bid, containing Contract Line Item Number (CLIN) prices for specific tasks. (Compl. at ¶ 9.) The proposal also contained Boeing's prices for the option years of the contract. (*Id.* at ¶ 10.) On June 29, 1998, USAF awarded the contract to Boeing. (Compl. ¶ 7; Mem of P. & A. in Supp. of Pl.'s Mot. for Summ.J. ("Pl.'s Mot.") at 13.) The CLIN prices and the option year prices from Boeing's proposal were incorporated into the contract. (Compl.¶ 11.) On July 6, 1998, USAF received a FOIA request from Lockheed seeking a copy of the contract. (Def. Statement of Material Facts at 1.)

When notified of Lockheed's FOIA request, Boeing agreed that a large part of the contract should be released. However, it objected to the release of those portions of the contract that it deemed to contain "confidential and proprietary pricing information" (Compl.¶ 17) [1] that would be protected from disclosure by § 552(b)(4) of FOIA. *See* 5 U.S.C. § 552(b)(4) (2000). During a two-year period of review that followed, USAF requested comments from Boeing on its position three times. (AR 3, 9, 33.) Boeing provided comments eleven times. (AR 7, 10, 11, 21, 30, 31, 37, 39, 40, 42, 43.) While Boeing was in the process of submitting its comments, USAF twice issued letters to Boeing explaining why the comments USAF had received thus far had not convinced it that it was not under a duty to honor the FOIA request. (AR 8, 12.)

Ultimately, USAF decided that the contested information should be released pursuant to Lockheed's FOIA request. On June 23, 2000, USAF issued its Final Administrative Decision Letter ("Letter") to Boeing. The twelve-page Letter addressed each point of fact and law made by Boeing in its comments and provided explanations for why USAF disagreed with Boeing's interpretations of the law and the facts. (AR 49.) The Letter explained that USAF intended to release the requested information on July 15, 2000. (Defs.' Statement of Material Facts ¶ 49.) After receiving the Letter, Boeing filed a two-count complaint seeking to prevent disclosure of the information. Boeing alleges in Count I that USAF's decision that this material was not protected from disclosure under § 552(b)(4) of FOIA was arbitrary, capricious and contrary to law, in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706. Count II

---

1. The specific portions of the contract that Boeing argues should not be disclosed are: CLIN 0006, CLIN 0008, CLIN 0010, CLIN 0011, CLIN 0012, CLIN 0013, CLIN 0015, CLIN 0016, CLIN 0018, CLIN 0020, CLIN 0106, and its option year pricing. (Compl.¶ 17.) Boeing also objects to the release of the contract modification in which Boeing states its "Material Handling Factor." (Pl.'s Mot. at 17.) It is unclear if any other contract modification information is at issue. If any other contract modification information is at issue, it, presumably, would be any contract modification that is contained within the CLINs to which Boeing has already objected.

alleges that USAF's decision to disclose violates the Trade Secrets Act ("TSA"), 18 U.S.C. § 1905.[2] The parties filed cross motions for summary judgment.

## APPLICABLE STATUTES

### I. APA

■ A party may challenge certain agency action under the APA, a statute which requires a reviewing court to "hold" unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.] 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review requires the court to 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Lykes Bros. Steamship Co. v. Pena,* Civ. A. No. 92–2780–TFH, 1993 WL 786964, at *2 (D.D.C. Sept. 2, 1993) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). A reviewing court must base· its review on the full administrative record that was available to the agency at the time of its decision. *See id.* A reviewing court does not substitute its judgment for the judgment of the agency under the arbitrary and capricious standard of review. Instead, the court simply determines whether the agency action constitutes a clear error in judgment. *See Bartholdi Cable Co. v. FCC,* 114 F.3d 274, 279 (D.C.Cir.1997).

■ Agency findings that are merely conclusory statements will not survive the arbitrary and capricious standard of review. A court may not "sanction agency action when the agency merely offers conclusory and unsupported postulations in defense of its decisions or when it ignores contradictory evidence in the record and fails to justify seeming inconsistencies in its approach." *Prof'l Pilots Fed'n v. FAA,* 118 F.3d 758, 771 (D.C.Cir.1997) (Wald, J., concurring in part and dissenting in part) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

### II. FOIA

■ FOIA creates a policy of disclosure and a presumption that information in the government's possession is producible upon request by anyone. *See Martin Marietta Corp. v. Dalton,* 974 F.Supp. 37, 40 (D.D.C.1997). This general rule of disclosure has nine statutorily defined exceptions. 5 U.S.C. § 552(b). This case implicates "Exemption 4," which excludes from disclosure matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

■ The applicability of Exemption 4 depends upon whether the information that a party seeks to have disclosed by the government was provided to the government voluntarily or under compulsion. *See McDonnell Douglas Corp. v. NASA,* 180 F.3d 303, 304 (D.C.Cir.1999). If the information was provided voluntarily to the government, the standard developed in *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871 (D.C.Cir.1992) (*"Critical Mass"*) applies. *See McDonnell Douglas Corp.,* 180 F.3d at 304. Under *Critical Mass,* if financial or

---

**2.** The TSA is a criminal statute that punishes government employees who release sensitive, financial information that they have no basis to release. *See* 18 U.S.C. § 1905; *CNA Fin. Corp. v. Donovan,* 830 F.2d 1132, 1138 (D.C.Cir.1987). The TSA, however, does not afford "a private right of action to enjoin disclosure in violation of the statute." *Chrysler Corp. v. Brown,* 441 U.S. 281, 316–17, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Because the TSA does not create a private right of action, defendants' motion for summary judgment will be granted with respect to Count II.

commercial information is submitted to the government on a voluntary basis, it "is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879.

■ If, however, the information was required to be submitted to the government, the test in *National Parks and Conservation Assoc. v. Morton*, 498 F.2d 765 (D.C.Cir.1974) ("*NPC*") applies. *See McDonnell Douglas Corp.*, 180 F.3d at 305. In *NPC*, the D.C. Circuit held that "commercial or financial matter is 'confidential' for purposes of [Exemption 4] if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *NPC*, · 498 F.2d at 770 (footnote omitted). The two grounds present distinct alternatives for denying disclosure of commercial information submitted to the government.

■ An agency is not required to prove that its predictions of the effect of disclosure are superior. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1155 (D.C.Cir.1987). It is enough that the agency's position is as plausible as the contesting party's position. *See id.* The harm from disclosure is a matter of speculation, and when a reviewing court finds that an agency has supplied an equally reasonable and thorough prognosis, it is for the agency to choose between the con-

testing party's prognosis and its own. *See id.*

### DISCUSSION

Boeing challenges USAF"s conclusions that Boeing's pricing information was compelled and not provided voluntarily, and that disclosure would harm neither the government nor Boeing in the future.

### I. *Compelled Information*

■ USAF properly concluded that Boeing's submission of the contested information to the government was not voluntary. Boeing was required to provide its cost and pricing information in order to complete the Air Force's Request for Proposal and be considered for the contract. (AR 52 at 40–41; AR 53.) This factual situation is distinctly different from the situation in *Critical Mass* where, despite the fact that the disclosing entity was under no obligation to provide the government with information, the disclosing entity volunteered safety reports to the government and received in return a promise that the information would not be disclosed. *See id.* at 874.

Because contractors are required to submit cost and pricing information if they wish to bid on a government contract, cases in this district have found price and cost requirements to be compulsory, not voluntary, submissions.[3] Since the contested information was not provided to USAF voluntarily for purposes of *Critical Mass*, *NPC's* two-prong test must be applied to determine whether the information is confidential under Exemption 4.

---

3. *See, e.g., Martin Marietta Corp.*, 974 F.Supp. at 39 ("Although the D.C. Circuit has yet to address the issue, district court precedent in this Circuit uniformly and firmly points to the conclusion that the financial/commercial information found in the [the government contracts at issue] was 'required' in the *National* *Parks* sense of the term[.]"); *Chemical Waste Mgmt., Inc. v. O'Leary*, Civ. A. No. 94–2230(NHJ), 1995 WL 115894, at *4 (D.D.C. Feb. 28, 1995) (requiring a bidder to submit information is compulsory, because a bidder must do it in order to obtain the contract).

## II. *Harm to the Government*

Boeing argues that the government provided, with no analysis or explanation, a conclusory statement that disclosing the contract would not impair its future ability to obtain information. (Pl.'s Mot. at 8, citing AR 49 at 3.) Boeing concludes that since "the record was replete with evidence" to the contrary, USAF's decision was arbitrary and capricious. (Pl.'s Mot. at 7–8.)

It is true that the government offered little analysis to justify its managerial decision that disclosure will not impair its ability to gather information in the future. There was, however, little to the contrary here to analyze. Contrary to Boeing's claim, the record was hardly "replete with evidence" of future harm to the government.[4] Instead, the record cited by Boeing merely reflects its own prediction that "[r]eleasing contractors' commercial pricing information ... will stifle the Government's commercial item acquisition initiative as surely as raising interest rates several points would slam the brakes on a surging economy." (AR 30 at 6–7.)

■■■ Although catchy, Boeing's prognostication is entitled to no greater weight than USAF's. The government agency from which disclosure is sought is in the best position to determine whether an action will impair its information gathering in the future. *See CC Distributor's Inc. v. Kinzinger,* Civ. A. No. 94–1330(NHJ), 1995 WL 405445 at *4 (D.D.C. June 28, 1995); *Comdisco, Inc. v. General Serv. Admin.,* 864 F.Supp. 510, 515–16 (E.D.Va.1994).[5] When an agency makes the decision to disclose information, a party opposing disclosure makes little head-

way in raising the issue of impairment of information gathering on the agency's behalf. *See Hercules, Inc.,* 839 F.2d at 1027. As one court said, when an agency "*wants* to disclose the disputed pricing information, it would be nonsense to block disclosure under the purported rationale of protecting government interests." *Comdisco,* 864 F.Supp. at 516 (emphasis in original). The managerial decision about how to best protect the government's interests in gathering information simply does not lend itself easily to judicial review. *See General Elec. Co.,* 750 F.2d at 1402.

■■■ The exemption exists to shield the government from making disclosures that would harm its long-term interests. Here, despite the fact that USAF has determined that its interests will not be harmed, Boeing seeks to use the exemption against the USAF, effectively telling USAF that Boeing knows better than USAF what is in USAF's long term interest. Given the unique nature of this exemption, "it would be an idle gesture to require [USAF] to devote resources to writing out a rationalization of its action." *See General Elec. Co.,* 750 F.2d at 1402. In the context of this exemption, requiring USAF to explain why *it* does not believe that *it* would be harmed by disclosing the information sought in the FOIA request, would simply "overjudicialize the administrative process[,]" *id.,* particularly since nothing in the record suggests that USAF's conclusion is inaccurate.

## III. *Harm to Boeing*

Boeing argues that USAF's decision that the evidence of likely substantial com-

---

4. Interestingly enough, Boeing at no point represents that should USAF disclose the contested information here, it would no longer apply for government contracts that required submission of information regarding the bidder's costs.

5. Citing *Hercules, Inc. v. Marsh,* 839 F.2d 1027, 1030 (4th Cir.1988); *Orion Research Inc. v. EPA,* 615 F.2d 551, 554 (1st Cir.1980); *General Elec. Co. v. NRC,* 750 F.2d 1394, 1402 (7th Cir.1984).

petitive harm did not rebut the presumption of disclosure was arbitrary and capricious. (Pl.'s Mot. at 6–22.) [6] Boeing has identified the portions of the contract that it believes would likely cause it substantial competitive harm should they be disclosed. Boeing has grouped the contested information into three categories for purpose of summary judgment: (1) Option Prices, (2) Vendor Pricing and Material Handling Factor,[7] and (3) "Over and Above" Prices.

## A. OPTION PRICES

 Boeing identifies two ways in which it believes that disclosure of option prices will likely cause it competitive harm. First, every year after disclosure, Boeing's competitors could use the option prices to convince USAF that it is not receiving proper value for the services Boeing provides. (*Id.* at 13–15.) Second, Boeing argues that if USAF chooses not to exercise its options and to conduct a new competition for the work, its competitors will be able to " 'deduce support hours, overhead factors, and profit factors for the options under [the contract,]' " and this information would likely cause substantial competitive harm to Boeing in the new competi-

tion. (*Id.* at 15–16) (quoting AR 10, at 6; Pl.'s Statement of Material Facts ¶ 19) (alteration in original).

USAF offered three arguments for why it believed option year CLIN prices should be disclosed. First, in deciding whether to exercise the options, USAF would look at price and cost as only one of several factors, and accord it no greater weight than any of the other factors. Second, as the Letter opined, there were too many variables for any competitor to successfully "reverse engineer" to any sensitive price information.[8] Finally, in a long-term contract, Boeing's current pricing predictions would not be of much value to competitors about Boeing's future pricing. (AR 49 at 8.)

Boeing takes great issue with USAF's argument that price is one of many factors and argues that the D.C. Circuit rejected this exact argument in *McDonnell Douglas*, 180 F.3d 303. The D.C. Circuit, however, did not rule on this exact issue. In *McDonnell Douglas*, the court rejected an argument by an agency that "underbidding due to the disclosure would not occur because price is only one of the many factors

---

6. Boeing also attempts to argue that USAF applied the wrong legal standard to analyze this prong, because at several points the USAF simply said the test was whether disclosure "will cause substantial competitive harm to Boeing," and did not precede this clause with the word "likely." (Pl.'s Mot. at 10.) But, as defendants point out, in several places, including the conclusion of the Letter, the word "likely" does appear. (Mem. of P. & A. in Supp. of Defs.' Mot. for Summ.J. ("Defs.' Mot.") at 8–13.) At worst, these omissions of the word "likely" are evidence that USAF occasionally used shorthand. They do not demonstrate that USAF applied the wrong legal standard.

7. USAF no longer intends to release the Material Handling Factor. (Pl.'s Mot. at 16 n. 7.)

8. Examples of the variables that would make it extremely difficult to reverse engineer are: 1) CLIN 0006 included Boeing's prices for C–

Check inspections; in the government's RFP, it included the historical standard hours it took to complete a C–Check inspection, but offerors were not required to use that information in their bids. The USAF explained that prices for C–Check inspections would be of minimal value because "[d]iffering approaches to performing the task as well as business decisions about the amount of risk the competitor wants to include in his bid affect how the bid was prepared[, and] no competitor could safely assume that Boeing proposed the standard number of hours for each C–Check." (AR 49 at 4); and 2) CLIN 0008 listed the prices to sand, scruff, and paint the aircrafts. USAF found that this would not be harmful to Boeing because a competitor would have no way of knowing the labor hours Boeing had estimated or the costs of the materials it was using. (*Id.* at 5.)

used by the government in awarding contracts." *Id.* at 306. This argument differs markedly from the argument advanced by USAF. USAF never claimed that underbidding would not occur because price was just one of many factors. The argument is that even if underbidding were to occur, the fact that price is just one of many factors means that the effect of the underbidding would be diluted by the other factors, and subsequently, the likelihood of competitive harm resulting from disclosure would be greatly reduced. (AR 49 at 8.) *McDonnell Douglas* does not preclude this argument.[9]

If USAF had asserted only this argument, Boeing might have an argument that the logic of *McDonnell Douglas* should be extended to this case. But, USAF also concluded that economic uncertainty about the future, coupled with all of the variables that are not in the contract that one would need in order to deduce sensitive information, cast serious doubt on the likelihood that any of the disputed information would be likely to cause substantial harm. (*Id.*)

## B. VENDOR PRICING

■ Boeing argues that competitors could easily "reverse engineer" its pricing strategy for Vendor Pricing. (Pl.'s Mot. at 17–19.) "The Vendor Pricing Factor is the markup Boeing placed on certain subcontracted materials and services in the bid price incorporated into the Contract." (*Id.* at 17.) Boeing alleges that since there is a limited number of subcontractors who can perform the work required in these types of contracts, competitors will have likely gone to the same subcontractors. Boeing argues that competitors could use the bids they have received from subcontractors and Boeing's Vendor Pricing Factor to calculate Boeing's markup rate, which is an inherent part of Boeing's pricing strategy. (*Id.* at 17–18.)

The USAF argues that it is not likely that such sensitive information could be determined. USAF argues from its knowledge of the government contracting industry that "it is entirely possible that a vendor would quote different prices to different customers, depending on factors such as volume buying and long-term business relationships." (AR 49 at 7.) Furthermore, USAF explained that it believed that a competitor would need Boeing's combined overhead and/or profit rate to derive any sensitive information. Because no competitor could determine these numbers with certainty, it is not likely that a competitor could do with the information anything that might cause substantial competitive harm to Boeing.[10]

---

**9.** *Furthermore, the facts in McDonnell Douglas differ significantly from those here. Aside from the argument that the price-cost variable is just one of many factors,* NASA asserted only two other arguments: 1) disclosure is part of doing business with the government; and 2) McDonnell Douglas' competitors would be the ones who suffered substantial competitive harm if this information were not disclosed. *See McDonnell Douglas,* 180 F.3d at 305–06. USAF has not made these types of conclusory claims and has, instead, offered a reasoned account for its position.

**10.** *Boeing argues that by writing that USAF did not believe that a competitor could deter-* mine with "certainty" Boeing's overhead/and or profit rate, the USAF demonstrated that it was requiring a showing that disclosure would cause substantial competitive harm, rather than a showing that disclosure would *likely* cause substantial competitive harm. (Pl.'s Mot. at 19.) Again, Boeing misinterprets the Letter. USAF claims that because a competitor cannot determine the overhead/and or profit rate with certainty, it is not likely that Boeing will suffer substantial competitive harm. Nothing in the letter suggests that USAF applied the wrong legal standard in determining that the vendor pricing could be disclosed.

## C. OVER AND ABOVE PRICES

 "Over and Above" rates are the rates that Boeing will charge for various tasks that USAF might need in addition to those contained in the contract. (Pl.'s Mot. at 20.) Boeing believes that because the average wage paid in the area of Boeing's facility is public knowledge, a competitor could use the listed "Over and Above" prices to determine Boeing's labor pricing factor. (Pl.'s Reply Mem. at 14.) The labor pricing factor is the markup for support labor, overhead, and profit. (*Id.* at 13). Boeing believes that knowledge of its labor pricing factor would likely cause serious competitive harm.

USAF disputes the predictive use of a standard rate and claims that a number of reasons exist for why Boeing would pay a higher base labor rate than what its competitors might pay. (AR 49 at 8.) For instance, Boeing might be attempting to attract the best candidates from the pool of available engineers, or it might be trying to tempt already employed mechanics to quit their jobs and come work for Boeing. *See id.* USAF argues that because reasons exist for paying an amount higher than the base labor rate, it is not likely that a competitor could safely use "Over and Above" rates to calculate Boeing's labor pricing factor. *See id.*

USAF has presented reasoned accounts of the effect of disclosure based on its experiences with government contracting. USAF's accounts are at least as compelling as Boeing's accounts, and USAF's decision to disclose was not arbitrary or capricious. *See CNA Fin. Corp.*, 830 F.2d at 1155.

## *CONCLUSION*

Summary judgment is appropriate when a party can show that "no genuine issue as to any material fact [exists] and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts here concerning what USAF considered and why it decided to disclose are not in dispute. USAF's Final Administrative Decision Letter was neither arbitrary nor capricious. Boeing's motion for summary judgment will be denied. Defendants' motion for summary judgment will be granted. A final Order will be issued.