# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 16, 2009        Decided March 23, 2010

No. 08-5435

UNITED TECHNOLOGIES CORPORATION,
PRATT & WHITNEY DIVISION,
APPELLANT

v.

UNITED STATES DEPARTMENT OF DEFENSE
AND DEFENSE CONTRACT MANAGEMENT AGENCY,
APPELLEES

———

Consolidated with 08-5436

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:05-cv-02271)

———

*Patricia A. Millett* argued the cause for the appellant. *Robert K. Huffman* and *Duncan N. Stevens* were on brief. *Emmett B. Lewis III* entered an appearance.

*Kathryn A. Donnelly*, Special Assistant United States Attorney, argued the cause for the appellees. *R. Craig Lawrence*, Assistant United States Attorney, was on brief. *Lanny J. Acosta Jr.*, Special Assistant United States Attorney, entered an appearance.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Sikorsky Aircraft Corporation (Sikorsky) and the Pratt and Whitney Division (Pratt) of United Technologies Corporation appeal the district court's grant of summary judgment to the Department of Defense (Defense or DoD) and the Defense Contract Management Agency (DCMA)[1] in Sikorsky's and Pratt's separate lawsuits to prevent the release of certain DCMA documents evaluating their respective quality control processes. Sikorsky and Pratt contend that DCMA's decision to release the documents was arbitrary and capricious in that it failed to properly apply Exemption 4 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4). We agree and remand.

## I.

This is a "reverse-FOIA" case. *See*, *e.g.*, *Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008). In enacting FOIA, the Congress sought to balance the public's interest in governmental transparency against "'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'" *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)). When an agency determines, pursuant to a FOIA request, to disclose information gathered from a non-governmental source, the source may contest the disclosure as arbitrary and capricious or not in accordance with law under the Administrative Procedure Act, 5 U.S.C. §§ 702,

---

[1]DCMA is "an agency of the Department of Defense." Dep't of Defense Directive No. 5105.64 (Sept. 27, 2000) (establishing DCMA). All references to DoD herein refer to DCMA as well.

706(2). *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (D.C. Cir. 1987).

As relevant here, Exemption 4 excepts confidential information from FOIA's scope. *See infra* Part II. According to the test we articulated in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), and reaffirmed en banc in *Critical Mass*, if a "person"[2] is *required to* provide information to the United States, the information is confidential under Exemption 4 only if its "disclosure would be likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Critical Mass*, 975 F.2d at 878 (quoting *Nat'l Parks*, 498 F.2d at 770).[3]

## A. Sikorsky, Pratt & DCMA

Sikorsky makes helicopters and Pratt makes aircraft engines. Both companies are wholly owned by United Technologies Corporation. Both have various foreign and domestic military and civilian customers and both sell their products to the United States.

DCMA monitors defense contractors, including Sikorsky and Pratt, to ensure they satisfy their contractual obligations when providing services and supplies to the United States. It keeps a regular presence at Sikorsky's and Pratt's facilities. If it

---

[2]"'[P]erson' includes an individual, partnership, corporation, association, or public or private organization other than an agency . . . ." 5 U.S.C. § 551(2).

[3]Alternatively, if a "person" provides information to the United States voluntarily, the information is confidential if "it is of a kind that the provider would not customarily release to the public." *Critical Mass*, 975 F.2d at 880.

discovers a problem, it notifies the contractor and may issue a "Corrective Action Request" (CAR) or an audit report to the contractor to remedy the problem.

### 1. Sikorsky FOIA Request

In March 2004 a New Haven, Connecticut television reporter submitted a FOIA request to the regional DCMA office (DCMA East) for, in pertinent part, all CARs DCMA had issued to Sikorsky over the past year regarding the Black Hawk helicopter.[4] The Director of DCMA East initially denied the request, concluding under Exemption 4 their release "will significantly impair DCMA's ability to obtain the same quality of information from Sikorsky and from other Defense contractors in the future." Letter from Keith D. Ernst, Director, DCMA East, to Alan M. Cohn, WTNH-TV (May 7, 2004). The reporter then appealed the denial within DCMA.[5] In response, the DCMA FOIA Appeal Authority reviewed the documents and reversed DCMA East's decision.

DCMA's Office of General Counsel then notified Sikorsky by letter that it planned to release the CARs, stating DCMA's new position that none of them fell under Exemption 4. Sikorsky disagreed. Citing *National Parks*, Sikorsky argued that

---

[4]The reporter also requested Sikorsky's responses to the CARs but DCMA ultimately decided not to release them. Those documents are not part of this appeal.

[5]DoD regulations provide, in relevant part, "If the official designated by the DoD Component to make initial determinations on requests for records declines to provide a record because the official considers it exempt under one or more of the exemptions of the FOIA, that decision may be appealed by the requester, in writing, to a designated appellate authority." DoD Regulation 5400.7-R, C5.3.1 (Sept. 1998), *available at* http://www.dtic.mil/whs/directives/corres/pdf/540007r.pdf.

Exemption 4 applied because the documents' "release would likely cause Sikorsky substantial competitive harm" and would "significantly impair DCMA's future ability to obtain the same detail and quality of information from Sikorsky and other DoD contractors." Letter from Robert K. Huffman, Miller & Chevalier, to Richard N. Finnegan, Associate General Counsel, DCMA, at 3 (Feb. 11, 2005). Specifically, it asserted that the CARs included "proprietary information regarding Sikorsky's manufacturing process and procedures" and that "[r]elease of this proprietary information would substantially harm Sikorsky's competitive position because its competitors would use this information to their advantage in . . . adjusting their manufacturing techniques." *Id.* at 11 n.4.

Nevertheless, in a letter dated December 1, 2005, the DCMA FOIA Appeal Authority informed Sikorsky that DCMA had made a "final agency decision" to release the CARs to the reporter. Letter from Colonel Jamie L. Adams, DCMA Appeal Authority, to Robert K. Huffman, Miller & Chevalier, at 5-6 (Dec. 1, 2005). In so doing, it rejected Sikorsky's "substantial competitive harm argument," stating that the asserted harm "appears to be one of suffering embarrassment in the market place," which is an "insufficient" basis on which to prevent disclosure. *Id.* at 5. It also rejected Sikorsky's "impairment" argument, stating that "the question of impairment is a question for the agency and not for Sikorsky" and concluding that "release of the CARs would not impair the Government's ability to obtain the same kind of information in the future." *Id.* at 3.

### 2. Pratt FOIA Request

In December 2004 a Hartford, Connecticut newspaper reporter submitted a FOIA request to DCMA East for (1) a report of a November 2004 DCMA audit of Pratt's Middletown, Connecticut Engine Center; (2) a CAR that resulted from the audit and (3) any and all other documents regarding the audit. DCMA East identified documents responsive to the request,

including (1) the November 2004 audit report; (2) November 2004 DCMA post-audit briefing of Pratt; (3) a resulting "Level III" CAR[6] issued to Pratt in December 2004; (4) internal DCMA correspondence about the audit and the Level III CAR and (5) reports of audits of Pratt that DCMA conducted in July and September 2004.[7] DCMA East notified Pratt of the request and asked Pratt to flag any documents it believed were exempt from disclosure. Pratt responded that "most of the information contained in these documents is exempt from disclosure under Exemption 4." Letter from Lester K. Katahara, Associate Counsel, Pratt & Whitney, to JeanMarie C. Faris, Counsel, DCMA-Hartford, at 1 (Mar. 24, 2005). Citing *National Parks*, it argued that the exemption applied because disclosure would "likely cause substantial harm to [its] competitive position" and "would likely impair the ability of DCMA to obtain information of the same quality, reliability, and detail in the future." *Id.* at 3. It submitted several affidavits supporting its claim to the Exemption. For example, its Director of Quality Military Engines attested that "a competitor with similar expertise could and would use th[e] information to gain insights into the

---

[6]There are four levels of CARs, increasing in seriousness from Level I to Level IV. DCMA issues a Level III CAR to a contractor's "top management to call attention to serious contractual nonconformity." DCMA Guidebook, Corrective Action Process 2.1, available at http://guidebook.dcma.mil/226/226-1/index.cfm.

[7]DCMA East determined not to release photographs it took during the November 2004 audit or Pratt's documentary responses to that audit and to the CAR. It decided that Exemption 4 covered the latter material because Pratt voluntarily made available the information contained therein and that information was the kind Pratt would not normally release to the public. *See Critical Mass*, 975 F.2d at 880. Similarly, it decided that Pratt was not required to permit DCMA to take photographs during the audit. *See id.* The photographs and Pratt's responses are not part of this appeal.

strengths and weaknesses of P&W's quality control system as well as manufacturing techniques and use those insights to revise and improve its own quality control and manufacturing systems." Affidavit of William H. Forthofer ¶ 18 (Mar. 18, 2005) (Forthofer Aff.). It also offered a set of the documents from which it had redacted the purportedly exempt information.

DCMA East replied to Pratt in October 2005, concluding that Exemption 4 did not cover the documents except for the portions DCMA had itself redacted. It stated:

> Applying the criteria established in *National Parks* to the documents at issue here, we conclude that release of the documents will not impair the Government's ability to obtain from Pratt & Whitney (or any other contractors) essential information about their quality systems. With respect to the competitive harm prong of National Parks, we concluded that, with the exception of the actual quality system provisions themselves, [which were redacted,] the release of the documents would not likely result in substantial competitive harm to Pratt & Whitney.

Letter from Steven T. Bogusz, Deputy Director, DCMA East, to Lester K. Katahara, Pratt & Whitney, at 1 (Oct. 12, 2005).

Pratt sought reconsideration, elaborating on the same arguments it had originally made. But DCMA East did not budge; it said, "While we agree that *National Parks* is the appropriate legal standard of review, we disagree that release of the documents (as redacted) would **significantly** impair DCMA's ability to obtain necessary quality assurance system information from P&W and other contractors in the future, a decision solely within DCMA's purview." Letter from Steven T. Bogusz, Deputy Director, DCMA East, to Robert K. Huffman, Miller & Chevalier, at 2 (Nov. 21, 2005). In addition, it said:

> We acknowledge that competition in the propulsion industry is fierce. However, with the exception of the information that we have already redacted, we do not believe that P&W has established the likelihood of substantial competitive harm flowing from P&W's competitor's [sic] affirmative use of the information contained in the DCMA documents. At most, we believe that release of the information could be embarrassing to P&W. But, embarrassment does not rise to the level of substantial competitive harm of the type recognized by the courts.

*Id.* at 3.

### B. District Court Proceedings

In late 2005 Sikorsky and Pratt filed separate suits in the district court against DoD, each alleging that DCMA's decision to release the documents was arbitrary, capricious, and contrary to law under the APA, 5 U.S.C. § 706(2)(A). They sought declaratory and injunctive relief preventing the documents' disclosure. The district court granted summary judgment to DoD in both cases in September 2008. Although the court found that the documents' release would "reveal[] the safety measures and quality control procedures in Plaintiff's manufacturing," it determined that the documents did not fall under Exemption 4. *Sikorsky Aircraft v. Dep't of Def.*, C.A. No. 05-02373, at 12-13 (D.D.C. Sept. 22, 2008) (Sikorsky Order); *United Techs. Corp., Pratt & Whitney Div. v. Dep't of Def.*, C.A. No. 05-02271, at 12-14 (D.D.C. Sept. 22, 2008) (Pratt Order). According to the court, the gravamen of both complaints was that disclosure would cause "embarrassment or negative publicity," a type of harm not recognized under Exemption 4. Sikorsky Order at 13; Pratt Order at 13. The court also held that DCMA's ability to obtain

similar information in the future would not be so impaired as to render the documents exempt from disclosure. Sikorsky and Pratt timely appealed.[8]

## II.

"We review the district court's grant of summary judgment *de novo*." *Canadian Commercial*, 514 F.3d at 39. When the district court decision under review itself reviews agency action under the APA, we, like the district court, will reverse the agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *Canadian Commercial*, 514 F.3d at 39. This "standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "[W]e do not defer to the agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

Exemption 4 covers "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). DoD concedes that the information contained in the documents either is or addresses "commercial . . . information obtained from a person"; for their part, Sikorsky and Pratt contend that the information is "confidential."[9] They "do not contend . . . that the particular

---

[8]We consolidated the appeals *sua sponte*. Order, *United Techs. Corp. v. Dep't of Def.*, No. 08-5435 (D.C. Cir. Mar. 5, 2009).

[9]Sikorsky and Pratt also suggest in passing that the documents contain "trade secrets" under Exemption 4. A trade secret is "a secret,

information at issue here was voluntarily provided," Appellants' Br. 33 n.10, and thus do not "seek review of th[e] aspect of the district court's decision" that "held that disclosure of the information was mandatory, not voluntary." *Id.* at 13 & n.3. Accordingly, for the documents to be exempt from disclosure, their release must be likely to cause the contractors "substantial competitive harm" or "impair the Government's ability to obtain necessary information in the future." *Canadian Commercial*, 514 F.3d at 39-40 (internal quotations omitted); *see Critical Mass*, 975 F.2d at 878; *Nat'l Parks*, 498 F.2d at 770.

## A. Substantial Competitive Harm

To qualify under this prong, an identified harm must "'flow[] from the affirmative use of proprietary information by competitors.'" *CNA*, 830 F.2d at 1154 (quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1290, 1291 n.30 (D.C. Cir. 1983)). In reviewing an agency's determination as to substantial competitive harm, we recognize that "predictive judgments are not capable of exact proof," *id.* at 1155, and we generally defer to the agency's predictive judgments as to "'the repercussions of disclosure,'" *McDonnell Douglas v. U.S. Dep't of the Air Force*, 375 F.3d at 1191 n.4 (quoting *CNA*, 830 F.2d at 1155). If "a reverse-FOIA movant has made a positive showing of competitive harm from disclosure," however, an agency's unelaborated contrary conclusion does not suffice. *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 341-42 (D.C.

---

commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities . . . that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983). Ultimately Sikorsky and Pratt label this issue "irrelevant," Reply Br. 6, because, to prevent release, they need only establish that the documents contain "confidential" information.

Cir. 1989) (internal quotation omitted) (agency's conclusory decision rejecting substantial competitive harm required remand).

Sikorsky and Pratt maintain that disclosure of the documents will cause two types of substantial competitive harm. First, they say that their competitors will use the documents to discredit them in the eyes of current and potential customers. They worry especially that their competitors will use the information and the accompanying negative publicity to persuade foreign costumers that DoD has found Sikorsky's and Pratt's quality control systems unreliable and, accordingly, their products' quality suspect. Because foreign customers are unfamiliar with DoD's exacting oversight, they reason, those customers will overreact to the disclosed information and Sikorsky's and Pratt's reputation will suffer as a result. Contrary to Sikorsky and Pratt's contentions, however, Exemption 4 does not protect against this species of harm. Calling customers' attention to unfavorable agency evaluations or unfavorable press does not amount to an "affirmative use of proprietary information by competitors." *See CNA*, 830 F.2d at 1154 & n.158; *Occidental*, 873 F.2d at 341 (desire to avoid embarrassment and reputational damage is irrelevant to substantial competitive harm determination); *Pub. Citizen*, 704 F.2d at 1291 n.30 ("injury to competitive position, as might flow . . . from the embarrassing publicity attendant upon public revelations" is not substantial competitive harm) (internal quotation omitted). In other words, Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury and DCMA correctly rejected the contractors' reliance thereon.

Second, Sikorsky and Pratt maintain that the documents contain sensitive proprietary information about their quality control processes. Pratt's Director of Quality Military Engines attested that "a competitor with similar expertise could and

would use th[e] information to gain insights into the strengths and weaknesses of P&W's quality control system as well as manufacturing techniques and use those insights to revise and improve its own quality control and manufacturing systems." Forthofer Aff. ¶ 18. Similarly, Sikorsky asserted that "proprietary information regarding Sikorsky's manufacturing process and procedures" is "inextricably intertwined with the quality control information" included in the CARs and it asserted that "[r]elease of this proprietary information would substantially harm Sikorsky's competitive position because its competitors would use this information to their advantage in . . . adjusting their manufacturing techniques." Letter from Robert K. Huffman, Miller & Chevalier, to Richard N. Finnegan, Associate General Counsel, DCMA, at 11 n.4 (Feb. 11, 2005).[10] In response, DCMA simply stated that it had redacted all of the sensitive proprietary information and concluded that disclosure of the remaining information was not likely to cause the contractors substantial competitive harm.

We find DCMA's response insufficient. The documents, even as redacted by DCMA, appear to reveal details about Sikorsky's and Pratt's proprietary manufacturing and quality control processes. At the least, they identify and locate particular parts and equipment and describe the timing and criteria of internal inspections.[11] In other words, the documents describe,

---

[10]Sikorsky and Pratt maintain that, while "the sensitivity of the information may not be obvious to laypersons," the information "from the vantage point of experienced competitors in the business . . . provide[s] invaluable insights." Appellants' Br. 22.

[11]During oral argument the Court inquired about portions of the CARs and November 2004 audit report included in the Sealed Appendix (SA). [Sealed material redacted.] Both Sikorsky and Pratt argue that competitors, with their expertise and understanding of esoteric manufacturing processes, will be able to put together this

in part, how the contractors build and inspect helicopters and/or engines. Once disclosed, competitors could, it appears, use the information to improve their own manufacturing and quality control systems, thus making "affirmative use of proprietary information" against which Exemption 4 is meant to guard.

We believe that DCMA failed to provide a reasoned basis for its conclusion to the contrary. To be sure, as it repeatedly stated, mere embarrassment or reputational harm is not sufficient to trigger Exemption 4. But where, as here, a contractor pinpoints by letter and affidavit technical information it believes that its competitors can use in their own operations, the agency must explain why substantial competitive harm is not likely to result if the information is disclosed. *See*, *e.g.*, *Occidental*, 873 F.2d at 341-42. DCMA instead concluded, without more, that release of the documents will not cause Sikorsky or Pratt substantial competitive harm. A naked conclusion, however, is not enough. *See McDonnell Douglas v. U.S. Dep't of the Air Force*, 375 F.3d at 1187 ("[W]e do not defer to the agency's conclusory or unsupported suppositions."); *Occidental*, 873 F.2d at 342 (requiring more than "conclusory statement" regarding substantial competitive harm). Accordingly, because DCMA's conclusionary statement is "unreviewable," *id.*, we must remand for it to "examine the relevant data and articulate a satisfactory explanation for its action," if it can, "including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168).

---

otherwise confidential information and use it to gain a competitive advantage.

## B. Impairment

Sikorsky and Pratt also argue that disclosure of the documents would "likely . . . impair the Government's ability to obtain necessary information in the future" and thus run afoul of the impairment prong of *National Parks*, 498 F.2d at 770; *see Critical Mass*, 975 F.2d at 878. Precedent suggests that it may be inappropriate to apply this prong in a reverse-FOIA case. *See McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 307 n.2 (D.C. Cir. 1999) (declining to reach issue but noting "one circuit has held that a submitter cannot even raise the government's interests on behalf of the agency in a reverse FOIA case") (citing *Hercules*, *Inc. v. Marsh*, 839 F.2d 1027, 1030 (4th Cir. 1988)); *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 215 F. Supp. 2d 200, 206 (D.D.C. 2002) ("The managerial decision about how to best protect the government's interests in gathering information simply does not lend itself easily to judicial review." (citing *Gen. Elec. Co. v. U.S. Nuclear Regulatory Comm'n*, 750 F.2d 1394, 1402 (7th Cir. 1984))), *rev'd on other grounds*, 375 F.3d 1182 (D.C. Cir. 2004); *Comdisco, Inc. v. Gen. Servs. Admin.*, 864 F. Supp. 510, 516 (E.D. Va. 1994) (when agency favors release, "it would be nonsense to block disclosure under the purported rationale of protecting government interests"). Because we remand on the issue of substantial competitive harm, we need not resolve this issue, *see Critical Mass*, 975 F.2d at 878, 880 (likelihood of *either* substantial competitive harm or impairment precludes disclosure); *Nat'l Parks*, 498 F.2d at 770 (same), assuming the impairment prong's applicability.

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand to the district court with instructions to remand to DoD for further proceedings consistent with this opinion.

*So ordered.*